UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

NINENA B. LUGO,

                      Plaintiff

-vs-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                      Defendant.
_____

DECISION AND ORDER

13-CV-6280 CJS

## APPEARANCES

For the Plaintiff:                Paul M. Ryther, Esq.
                                    97 Main Street, P.O. Box 278
                                    East Bloomfield, New York 14443

For the Defendant:              Mary C. Kane, Esq.
                                    United States Attorney's Office
                                    138 Delaware Avenue
                                    Buffalo, New York 14202

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied the application of Ninena Lugo ("Plaintiff") for Social Security Supplemental

Security Income disability benefits.  Now before the Court is Plaintiff's motion (Docket

No. [#8]) for judgment on the pleadings and Defendant's cross-motion [#9] for judgment

on the pleadings.  Plaintiff's application is denied and Defendant's application is granted.

## PROCEDURAL HISTORY

Plaintiff maintains that she became unable to work on November 30, 2007. (115)

1

When Plaintiff applied for benefits, she stated that the following conditions prevented her from working: migraines, severe depression, and asthma. (115)  As for how those conditions prevented her from working, Plaintiff stated: "Most days I sit and cry for no reason.  I don't like to go out of the house.  I can not be around a lot of people.  I get nervous and sweat a lot and start crying." (115)  In addition to those ailments, Plaintiff contends that she is disabled by anxiety/social phobia, shoulder pain, and back pain. Despite those problems, Plaintiff has "no difficulty" sitting or walking. (45).  Plaintiff cannot lift more than five or ten pounds with her left arm, but she is right handed, and has no limitations concerning right-handed lifting. (43, 376)

On June 27, 2008, Plaintiff protectively filed for SSI benefits. (106-08, 121).  On October 8, 2008, her application was initially denied. (68-71). She requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 72-73), and on May 13, 2010, she appeared before the ALJ with her attorney (72-73, 35).  On July 16, 2010, the ALJ issued a decision finding Plaintiff not disabled. (21-29).  The ALJ found that Plaintiff could perform her past relevant work, and alternatively, that she could perform other work. Plaintiff requested review by the Appeals Council (5-16). On December 27, 2010, the Appeals Council denied Plaintiff's request for review.  Accordingly, the ALJ's decision became the final decision of the Commissioner (1-4).

On January 19, 2011, Plaintiff commenced an action in this Court, challenging the Commissioner's decision pursuant to 42 U.S.C. § 405(g). *See, Lugo v. Commissioner of Social Security*, 11-CV-6028 CJS (W.D.N.Y.).  In defending the action, the Commissioner devoted little argument to whether the ALJ had been correct to find that Plaintiff could perform her past relevant work, but argued that the ALJ had been correct in finding that

Plaintiff could perform other work.  On March 20, 2012, this Court issued a Decision and Order granting Plaintiff's motion for judgment on the pleadings, and remanding the matter to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four. (419).  In that regard, the Court found, in pertinent part, that the ALJ should have obtained testimony from a vocational expert, rather than relying upon the "grids."  On May 7, 2012, the Appeals Council vacated the ALJ's decision and remanded the matter for a new hearing. (486).

On January 23, 2013, Administrative Law Judge Brian Kane ("the ALJ") conducted a hearing.[1]  Plaintiff appeared at the hearing with her attorney.  On February 21, 2013, the ALJ issued a decision, finding that Plaintiff was not disabled at any relevant time, and that she could perform her past relevant work as a factory assembler, which is listed in the Dictionary of Occupational Titles ("DOT") as number 706.687-010. (338-346)  On May 30, 2013, Plaintiff commenced this action, again seeking review of the Commissioner's decision.  On February 24, 2014, Plaintiff filed the subject motion [#8] for judgment on the pleadings, and on March 18, 2014, Defendant filed the subject cross-motion [#9].  On June 5, 2014, counsel for the parties appeared before the undersigned for oral argument.

## VOCATIONAL HISTORY

At the first hearing, Plaintiff indicated that she completed three semesters of college, studying business administration. (41, 237).  She further indicated that in the Spring of 2009, she began taking online classes, but that in or about September 2009, she stopped taking classes because she was distraught over being the victim of a crime

---

[1]One of Plaintiff's contentions in this action is that the ALJ did not conduct a *de novo* hearing.

some months earlier. (298)  At the second hearing, Plaintiff indicated that she finished a year of college and never went back. (363)

Plaintiff's longest period of employment, lasting approximately one year, was as a deli worker in a supermarket, making pizza and salad, and cutting meats. (116)  Such work involved standing for eight hours per day, frequently lifting up to ten pounds, occasionally lifting up to twenty pounds, and handling and reaching. (116-117)   Plaintiff also worked as a "Medical Counselor II," for about a year, working with persons with developmental disabilities. (116, 359)  That job required Plaintiff to lift up to 200 pounds. (359)  Plaintiff has also been employed as a retail customer service representative/cashier, a home health aide, and a cafeteria worker. (131-132).

In 2003, Plaintiff worked in a factory manufacturing batteries. (37-38)  Plaintiff stayed at that job "[a]lmost ... a whole year," but quit when she became pregnant because "chemicals" were making her sick. (38, 358, 360)  Subsequently, Plaintiff worked for a few months as a "child care worker," but apparently left that job because it did not provide her with enough hours. (115)  Plaintiff's last employment ended on August 15, 2004. (115).

Plaintiff did not leave any of her jobs due to her claimed impairments.  Instead, Plaintiff indicates that the onset of her disability occurred in November 2007, several years after she last worked at any job.

ACTIVITIES OF DAILY LIVING

Plaintiff is able to care for herself and her four young children, with occasional help from her mother. (505)   Plaintiff indicates that she does not leave the house much, and that friends visit her to socialize and watch television. (44, 507)

4

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in the parties' submissions and need

not be repeated here in its entirety.  It is sufficient for purposes of this Decision and

Order to note the following facts.  Plaintiff's primary care providers are Dong Gi Hong,

M.D. ("Hong") and nurse practitioner Rena Reed, MSNP ("Reed"), although she is mainly

seen by Reed. (133)  Reed treats Plaintiff for asthma, allergies, anxiety, back and

shoulder pain and depression. (134-135)  Plaintiff also sees neurologist Eugene

Tolomeo, M.D. ("Tolomeo") for migraine headaches. (126)  Plaintiff has also seen

orthopedists Daniel Alexander. M.D. ("Alexander") and David Cywinski, M.D. ("Cywinski")

for pain and dislocation in her left shoulder. (133)  Plaintiff has also been treated by

therapist Eileen Ersteniuk, CSWR ("Ersteniuk"), psychiatrist Royle Miralles, M.D.

("Miralles") and nurse practitioner Lauren Morgan, NP, ("Morgan") at Wayne Behavioral

Health Network for depression and anxiety. (139)

Plaintiff takes Albuterol and Flovent for asthma, Zyrtec for allergies, and Neurontin

for anxiety. (134) Plaintiff also takes Tylenol #3 for back and shoulder pain and Topamax

for headaches. (135)  Topamax is an anti-seizure medication that is used prophylactically

to prevent migraine headaches from occurring.  Plaintiff also takes Naprosyn (Aleve), a

nonsteroidal anti-inflammatory drug, when headaches occur, and Effexor for depression.

(136)

On September 22, 2004, Plaintiff, who had given birth in June 2004, complained

to Reed about headaches. (187-188)  Plaintiff reported that she had severe headaches

during the pregnancy and was now having them again, with blurred vision and occasional

nausea. (188)  Plaintiff also complained of pain in both ears. *Id*.  Reed's impression was

acute sinusitis (sinus infection). *Id*.

On February 9, 2005, Plaintiff told Hong's office that her left shoulder had popped out of its socket the previous day, apparently while she was trying to prevent herself from falling. (186)

On February 27, 2006, Plaintiff had diagnostic testing of her lumbosacral spine, after she complained of pain resulting from a fall four days earlier. (227)  The testing was normal, with no degenerative disease or other problems observed. *Id*.

On March 27, 2007, Tolomeo examined Plaintiff in connection with her complaints about headaches. (283)  Tolomeo indicated that he had been "following" Plaintiff "for quite some time for headaches," and that he "had them under control during her last visit," the date of which is unclear. *Id*.  Plaintiff told Tolomeo that she was then having headaches every day, ranging in severity from 4/10 to 10/10. *Id*.   Plaintiff's mental status was normal. *Id*.  Tolomeo indicated that Plaintiff had "chronic migraine headaches," which were "tension type headaches." *Id*.  Because Plaintiff was pregnant, Tolomeo indicated that his treatment options were limited. *Id*.  However, he prescribed magnesium oxide to prevent headaches, and told Plaintiff that she could take Tylenol #3 for pain if needed. *Id*.

In August 2007 Plaintiff began receiving counseling for depression at Wayne Behavioral Network. (118)   On September 14, 2007, Ersteniuk conducted an assessment for services. (154-162)  At that time, Plaintiff was pregnant and due to give birth to her third child later that month. (155)  Plaintiff indicated that she never previously received any psychiatric treatment. (154)  Ersteniuk reported that Plaintiff had good communication skills. (158)  Ersteniuk further noted that Plaintiff was well groomed and

calm, with appropriate affect, spontaneous speech, and focused thoughts. (160)

Plaintiff's mood was "anxious." *Id*. Plaintiff's orientation, memory and concentration were

intact, though her insight and judgment were limited. *Id*. As for her reason or goal for

seeking treatment, Plaintiff stated that she was having problems with her boyfriend and

wanted to learn how to communicate more effectively with him. (161) In that regard, she

stated that she wanted to learn to control her anger and express her feelings. *Id*.

Ersteniuk opined that Plaintiff had a total Global Assessment Functioning ("GAF") score

of 55, based on depressed mood and moderate problems in social functioning. *Id*.

On October 25, 2007, Plaintiff told Reed that her headaches were "terrible." (182)

Again, Reed's impression was "acute sinusitis" (sinus infection). *Id*. Reed noted that

Celebrex did not appear to be helping, and she prescribed another medication. On

October 30, 2007, Plaintiff had a CT scan of her head, to attempt to determine the cause

of her headaches, which was negative. (223)

On December 6, 2007, Miralles conducted a psychiatric assessment. (163-166)

Plaintiff stated that she had felt depressed for 18 months, particularly near the end of her

pregnancy. (163) After the birth of her third child in or about September 2007, Plaintiff

stated that she had frequent crying spells and felt irritable and apathetic. *Id*. She stated

that she had suicidal ideation in November 2007, and was experiencing anxiety. *Id*.

Plaintiff stated that she felt stressed because her mother had been diagnosed with

cancer, her boyfriend was depressed, and she did not feel that she was adequately

caring for her children or boyfriend. *Id*. Plaintiff reported a history of physical and sexual

abuse as a child. (164) Plaintiff's grooming and hygiene were poor, but her mental

functioning was normal, though she felt depressed. (165) Plaintiff expressed fear of

7

being alone, and stated that she had difficulty falling and staying asleep. *Id*.  Miralles

prescribed Paxil and directed Plaintiff to continue therapy with Ersteniuk. (166)

On December 7, 2007, Morgan completed a Diagnostic Review form. (167-168)

Morgan indicated that Plaintiff's diagnosis was major depressive disorder, single episode.

(167)  Morgan noted that Plaintiff, who had a history of depression, was "struggling with

single parenting and trying to work on her relationship." (168)

On September 15, 2008, Plaintiff reported to Hong's office that her "migraines

[were] more frequent and worse when [she] has one." (179)

On September 26, 2008, Plaintiff was examined by Harbinder Toor, M.D. ("Toor"),

a non-treating consultative internist. (233-236)  Plaintiff told Toor that her chief complaint

was migraine headaches, though she also complained of depression and asthma. (233)

Plaintiff apparently did not complain of any problems with her shoulder or back, and Toor

reported that Plaintiff's physical examination was normal. (234-235)  In that regard, Toor

indicated that Plaintiff had full range of movement and full strength in all her extremities,

including full range of movement in her shoulders, and full flexion and rotary movement in

her lumbar spine. (235)  Additionally, the straight leg raising test was negative bilaterally.

Plaintiff told Toor that she was able to care for herself and her children and perform all

household chores. (234)  With regard to headaches, Plaintiff indicated that she had

"migraines since she was 15 years old," and was having them "every day." (233)  Plaintiff

stated that the pain was sometimes 10 out of 10, with nausea and sensitivity to light.  *Id*.

Plaintiff reported that she treated the headaches by taking medication and lying down. *Id*.

Toor opined that Plaintiff's headaches "can interfere with her routine," and that she

should avoid irritants that could bother her asthma. (236)

On September 26, 2008, Plaintiff was given a psychiatric evaluation by Christine Ransom, Ph.D. ("Ransom"), a non-treating consultative examiner. (237-240)  Plaintiff reportedly told Ransom that she had been unable to work due to "severe depression." (237)  Plaintiff indicated that her medical conditions consisted of "headaches and asthma." (237)  Plaintiff complained of difficulty falling asleep, erratic appetite, crying spells, irritability, and low energy. (238)  Plaintiff indicated that she spent most of her time caring for her three children. (238)  Plaintiff complained of difficulty concentrating for long periods.[2]  Plaintiff stated that she became "anxious" around strangers, but denied any "generalized anxiety, panic attacks, manic symptomatology, thought disorder, cognitive symptoms and deficits." (238)  Upon examination, Ransom found that Plaintiff's thoughts were "[c]oherent and goal directed with no evidence of hallucinations, delusions or paranoia." (238)  Plaintiff's affect and speech were "moderately dysphoric." (238) Plaintiff's attention, concentration, and memory were intact, her cognitive functioning was average, and her insight and judgment were good. (239)  Ransom concluded that Plaintiff could understand and follow simple directions, perform simple tasks, maintain attention and concentration for simple tasks, and learn new simple tasks. (239)  Ransom indicated that Plaintiff could have moderate difficulty performing complex tasks, relating adequately with others, and dealing with stress. *Id*.  Ransom's impression was major depressive disorder and social phobia, both "currently moderate," and her prognosis was "fair to good with continued and further medication management." (239-240)

On October 17, 2008, Plaintiff informed Reed that she was awaiting an

---

[2]Ersteniuk had previously indicted that Plaintiff's concentration was intact (160), and Ransom also found that Plaintiff's concentration was intact. (239)

appointment to see Tolomeo for her headaches. (265)

In November 11, 2008, Plaintiff returned to see Tolomeo regarding headaches. (284)  Tolomeo reported that he had not seen Plaintiff for a year, during which time her headaches were apparently under control, but that, "her headaches have returned." *Id*. Plaintiff stated that she had headaches every day.  Significantly, though, she had not been taking any medication to prevent the headaches, and she was treating them with only Tylenol and sleep. *Id*.  Plaintiff's mental and physical condition appeared normal. *Id*. Tolomeo opined that Plaintiff's headaches were a combination of migraine and tension type headaches. *Id*.  Tolomeo prescribed Topamax to prevent the headaches, and told Plaintiff that she could take Naprosyn for pain as needed. *Id*.[3]

On February 20, 2009, Ersteniuk reported that Plaintiff was "doing ok" and taking Effexor. (267)  Plaintiff's mood was stable, her though process was logical, her insight, judgment and concentration were fair, and her attention and energy level were good. *Id*.

On May 12, 2009, Wayne Behavioral Health discharged Plaintiff from treatment, because she was "stable" and had "returned to school for nursing," and was continuing to receive medication from her primary care physician. (278)  Ersteniuk further stated: "Client no showed and cancelled several  appts and no longer received medications at this clinic.  Client stable and returning to college." (279)

On September 1, 2009, Reed reported that Plaintiff was complaining of low back pain: "Also [complaining of] pain lower back started yesterday after daughter got her foot caught in mattress spring [and] Ninena had to hold her sitting on floor for 20-30 minutes."

---

[3]There is no indication that Plaintiff saw Tolomeo again.  Plaintiff did see Hong/Reed on several occasions after this in 2009 and 2010 (320-329), and it appears that she only complained of a headache on one occasion. (320).

(320)  Reed's impression was "acute low back strain." *Id*.  On September 15, 2009, Plaintiff reported that her back was still painful. *Id*.  Several months later, Plaintiff reported that her back was "much better" with only an occasional spasm. (328)

On September 15, 2009, Ersteniuk reported that Plaintiff returned for further counseling/therapy.  Plaintiff indicated that she had been doing well and taking online classes, but had become distraught about a crime that was committed against her two months earlier. (296)  Plaintiff stated that she had "quit school" and was "just sitting at home." *Id*.  Upon examination, Plaintiff was cooperative and calm, and had an appropriate affect, though she was sad and anxious. (295)  Plaintiff's thoughts were focused, and her orientation, memory, and concentration were intact. (296)  Ersteniuk noted that Plaintiff's insight was poor and her judgment was limited. *Id*.   Plaintiff reported being sad and having frequent crying spells. *Id*.  Plaintiff indicated that she was taking care of her three children full time and felt overwhelmed. *Id*.  Plaintiff stated that she was continuing to receive medications from her primary care physician. *Id*.

On January 4, 2010, Plaintiff told Reed that her left shoulder "popped out of [its] socket," and then "popped back in." (323)  Diagnostic testing of Plaintiff's left shoulder showed no evidence of dislocation or significant bony abnormality. (309)  Effat Jehan, M.D. ("Jehan") examined Plaintiff, and Plaintiff reportedly told Jehan that the same shoulder had popped out of its socket "10 years ago," but that it had not happened "since then." (324)

On January 26, 2010, Ersteniuk reported that Plaintiff had "a new boyfriend in her life and her mood has improved." (305)

On January 27, 2010, Plaintiff told Reed that she'd had an asthma attack the

previous night. (323)

On February 22, 2010, Plaintiff told Reed that her left shoulder had popped out and back in again, but the record does not indicate when this occurred. (328)  Plaintiff had full range of movement in the shoulder, with pain. (328)

On March 2, 2010, Reed stated in an office note that her impression was "chronic depression" and "chronic anxiety," though there is no indication that Plaintiff complained about either condition on that date. (329)  Reed noted that she had completed Plaintiff's disability paperwork, and that she intended to continue Plaintiff on antidepressants. *Id*.

On March 2, 2010, Hong completed a mental Residual Functional Capacity Assessment of Plaintiff. (312-315) Hong attributed Plaintiff's non-exertional limitations to two conditions: "chronic depression" and "chronic anxiety." (315)  The form report required Hong to rate Plaintiff's mental abilities as either "unlimited," "good," "fair" or "poor."  The report form defined "fair" as follows:  "The ability to function in this area is seriously limited and will result in periods of unsatisfactory performance at unpredictable times."  The report defined a "poor" rating to mean "No useful ability to function in this area." (312)  Hong indicated that Plaintiff had a fair ability to understand and carry out simple instructions, remember work procedures, remember detailed instructions, respond appropriately to supervision, respond appropriately to co-workers, exercise appropriate judgment, abide by occupational rules, make simple work-related decisions, and maintain social functioning. (312-314)  Hong stated that Plaintiff had only a poor ability to function independently on a job, concentrate over an 8-hour work period, be aware of normal hazards, and tolerate customary work pressures. (313-314)  Hong added that Plaintiff "does not tolerate pressure well," and would experience "increased anxiety" if placed

12

under pressure. (314)  Hong also stated that Plaintiff would have "good days and bad days," and would probably miss "more than four days per month" from work as a result of her impairments.

On March 2, 2010, orthopedic surgeon Alexander wrote a consultation report to Reed concerning Plaintiff's left shoulder.  Plaintiff reportedly told Alexander that she was a "chronic dislocator" since age sixteen, and that her "shoulder pops out all the time." (331)  Upon examination, Plaintiff's shoulder was tender, but had good strength (4/5) and range of motion. (331)  Alexander recommended obtaining an MRI and having Plaintiff perform exercises to increase strength and range of motion. (332)

On March 8, 2010, MRI testing was performed on Plaintiff's left shoulder. (310) The impression was "supraspinatus tendinopathy with minimal articular sided partial tear," and "abnormal signal at the anterior glenoid labrum consistent with injury from previous shoulder dislocation." *Id*.

On March 9, 2010, orthopedic specialist Cywinski examined Plaintiff and reviewed the MRI results with her. (333-334)  Plaintiff told Cywinski that her shoulder had popped out three times during the last three weeks. (333)  Cywinski observed that Plaintiff had "mild tenderness" in the shoulder. *Id*.  Cywinski recommended that Plaintiff pursue "aggressive physical therapy" for three-to-six months, and then consider surgery if the condition did not improve. *Id*.

On March 29, 2010, Hong completed a "Migraine Headache Questionnaire" for Plaintiff's counsel. (316-319)  Hong stated that Plaintiff's headaches occurred "every other day the whole day" (316)  Hong indicated that Plaintiff's pain was "moderate," meaning that it "inhibits but does not wholly prevent usual activity." *Id*.  Hong checked

13

boxes on the form indicating that Plaintiff's headaches would cause "significant interference with activity," and would be painful enough to interfere with her attention and concentration needed to perform simple tasks. (317)  The form asked Hong to answer several questions about Plaintiff's treatment regimen, including whether her headaches were controlled by medication, and whether her complaints were consistent with Hong's diagnosis.   However, Hong left that portion of the report blank. (318)  Moreover, Hong's/Reed's office notes between 2009-2010 are essentially devoid of any mention of headaches.

On June 15, 2010, Reed completed an employment report, indicating that Plaintiff was capable of working part-time. (609)  However, Reed stated that Plaintiff did not want to work: "Pt. [patient] does not want to work - feels she gets uncomfortable in crowds." *Id*. However, Reed stated:  "I think this woman needs a goal in life – physically she can work." *Id*.

On November 18, 2010, Cywinski observed that Plaintiff was still complaining of recurring dislocation of the left shoulder, despite physical therapy. (598)  Cywinski indicated that he would send Plaintiff for a surgical consultation at Strong Memorial Hospital in Rochester. (598)

On December 20, 2010, Plaintiff contacted Wayne Behavioral Network and indicated that she was "feeling good," but wanted to talk to Ersteniuk. (602)  On January 11, 2011, Ersteniuk completed an office note in which she indicated that Plaintiff's diagnosis was "[m]ajor depressive disorder, recurrent, mild." (602)  Ersteniuk noted that Plaintiff was returning for treatment, after an absence of "several months," "after interaction with housing authority and DSS." *Id*.  Ersteniuk noted that Plaintiff had been

14

"inconsistent with therapy." *Id*.  On the same date, Ersteniuk completed an employment report indicating that Plaintiff was unable to work due to "depression," without further explanation. (610)  In February 2011, Plaintiff postponed an appointment with Ersteniuk, and then failed to appear for the rescheduled appointment. *Id*.

On March 14, 2011, Plaintiff was examined by Donovan Holder, M.D. ("Holder") of the Pain Treatment Medicine Office in Clifton Springs, New York.  Plaintiff reportedly indicated that she slipped on a wet floor when she was fifteen years old and injured her back and left shoulder, and that she was experiencing pain radiating into her neck and head. (600) Plaintiff also complained of daily "occipital headaches." *Id*.  Holder recommended that Plaintiff receive pain injections in her shoulder, and then receive occupational therapy. (601)  However, Plaintiff claims that she never received such injections, because she was pregnant in 2011. (377)  At the time of the hearing in 2013, Plaintiff had never returned to Holder for such treatment, and claimed that it was because she was waiting for Reed to give her a referral to see Holder. (377)

On April 20, 2011, Ersteniuk terminated Plaintiff as a patient, based on Plaintiff's failure to keep appointments, and her failure to respond to a letter she sent. (610) (Ersteniuk had previously discharged Plaintiff in 2009 for failing to keep appointments, and because Plaintiff was stable and had returned to college. (277-279))  At the hearing before the ALJ on January 23, 2013, Plaintiff indicated that she had not seen Ersteniuk since 2011, and in fact she could not recall Ersteniuk's last name. (374-376)  Curiously, Plaintiff implied that she stopped seeing Ersteniuk for therapy/counseling, as opposed to

receiving medication, at the direction of her OB/GYN. (375-376)[4]  However, Plaintiff

indicated only that she needed to stop taking her mental health *medications* because she

was pregnant, and her OB/GYN "d[id]n't want to mix [Plaintiff's] medications." (375-376)

Plaintiff actually gave no explanation for why she stopped seeing Ersteniuk for

psychotherapy/counseling while she was pregnant, nor did she explain why she did not

resume treatment once she gave birth.  At the hearing, Plaintiff further stated: "I have not

gone back yet [to Wayne Behavioral Health] because I had other health issues, and she

was waiting because *she* doesn't want to mix my medications." (376) (emphasis added)

It is unclear whether the "she" in that statement refers to Reed or the OB/GYN.

However, any suggestion that Plaintiff was delaying further treatment at the direction of

her OB/GYN is unsupported in the record, and is doubtful since Plaintiff was not pregnant

at the time.  Similarly, any suggestion that such treatment was stopped at Reed's

direction is contradicted by the record.  Specifically, on December 11, 2012, Reed

provided Plaintiff a referral to Wayne Behavioral Health (624), which Plaintiff apparently

never acted upon.

On July 23, 2012, Reed indicated that Plaintiff had come to see her for a "recheck

of migraine headaches." (611)  Plaintiff complained to be experiencing headaches lasting

three days per episode. *Id*.  Plaintiff reportedly indicated that she was having trouble

sleeping and felt depressed, but denied having anxiety or mood changes. *Id*.  A physical

---

[4]Plaintiff indicated that she was receiving medication and psychotherapy. (374)  In response to
Plaintiff's testimony that she stopped taking her depression/anxiety medicine because she was pregnant,
the ALJ asked, "So you stopped going for *therapy* too?" (375) (emphasis added)  Plaintiff's  answer
indicated that her OB/GYN "told her to stop everything," because she didn't want Plaintiff to "mix
medications," but the answer was essentially unresponsive as to why she would need to stop
psychotherapy altogether simply because she was pregnant.

examination was normal, though Reed noted that Plaintiff was obese. (612)  Reed's impression was asthma, migraine headaches, obesity, depression and seasonal allergies. (613)  Reed recommended that Plaintiff adjust her diet and begin to exercise. *Id*.  Reed prescribed Topamax for Plaintiff's headaches. (613)

On August 6, 2012, Reed indicated that Plaintiff's headaches were improving due to her use of the medication Topamax. (615)

On November 26, 2012, Reed reported that Plaintiff was complaining of headache and pain in her shoulder and back. (619)

On December 11, 2012, Reed reported that Plaintiff's headaches were now lasting only one day per episode, but were becoming more frequent. (621)  Plaintiff also complained of muscle pain in her back. *Id*.  Reed prescribed Flexeril. (624)  That same day, Reed completed a report concerning, *inter alia*, Plaintiff's ability to work, which, while being less than perfectly legible, appears to indicate that Plaintiff is "unable to tolerate bright lights, hot environments, stress." (626).  Reed's report indicates that Plaintiff has no physical limitations, but that she is moderately limited with regard to understanding and remembering instructions, maintaining attention/concentration and functioning in a work setting at a consistent pace. *Id*.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

17

Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . .  that opinion will not be deemed controlling.   And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(c)(4), formerly designated as 20 C.F.R. §

404.1527(d)(4)).  Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of
> a treating physician must consider various 'factors' to determine how much
> weight to give to the opinion. 20 C.F.R. § 404.1527[(c)](2). Among those
> factors are: (i) the frequency of examination and the length, nature and
> extent of the treatment relationship; (ii) the evidence in support of the
> treating physician's opinion; (iii) the consistency of the opinion with the
> record as a whole; (iv) whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's attention that tend to
> support or contradict the opinion. *Id*. The regulations also specify that the
> Commissioner 'will always give good reasons in [her] notice of
> determination or decision for the weight [she] give[s] [claimant's] treating
> source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927[(c)](2); *see also Schaal*,
> 134 F.3d at 503-504 (stating that the Commissioner must provide a
> claimant with "good reasons" for the lack of weight attributed to a treating
> physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  However, an ALJ is not required to

explicitly discuss each factor, as long as his "reasoning and adherence to the regulation

are clear." *Atwater v. Astrue*, 512 Fed. Appx. 67, 70, 2013 WL 628072 at *2 (2d Cir. Feb.

21, 2013) ("Atwater challenges the ALJ's failure to review explicitly each factor provided

in 20 C.F.R. § 404.1527(c). We require no such slavish recitation of each and every

factor where the ALJ's reasoning and adherence to the regulation are clear.") (citation

omitted).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in the Commissioner's regulations,

which state, in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence. By objective medical evidence, we mean medical signs and

laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b)(2) through (8) and 404.1513(b)(1), (4), and (5), and (d). These include statements or reports from you, your treating or nontreating source, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your treating source or nontreating source, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

*** 

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

relevant part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).  However, while an ALJ is required to consider these factors, he is not required to explicitly discuss each one. *See, Pellam v. Astrue*, 508 Fed.Appx. 87, 91, 2013 WL 309998 at *3 (2d Cir. Jan. 28, 2013) ("The ALJ did not apply an incorrect legal standard when judging the credibility of Pellam's testimony. Although the ALJ did not explicitly discuss all of the relevant factors, Pellam has failed to point to any authority requiring him to do so. In any event, the ALJ cited the applicable regulation, 20 C.F.R. § 404.1529, explicitly mentioned some of the regulatory factors (such as Pellam's limited use of pain medication), and stated that he considered all of the evidence required by § 404.1529.").  If it appears that the ALJ considered the proper factors, his credibility determination will be upheld if it is supported by substantial evidence in the record. *Id*.

THE ALJ'S DECISION

On February 21, 2013, the ALJ issued the decision that is the subject of this action. (338-346).

At the first step of the five-step sequential analysis described above, the ALJ found that Plaintiff had not engaged in substantial gainful employment since June 27, 2008, the application date. (340)

At the second step of the analysis, the ALJ found that Plaintiff had the following severe impairments: "major depressive disorder, migraine headaches, asthma, and left shoulder labral tear." (340)[5]  In that regard, the Court observes that the ALJ found that Plaintiff's shoulder condition was severe, while the prior ALJ had not.

---

[5]Defendant is advised that, when describing the ALJ's findings at steps two and three of the sequential analysis,  her brief appears to mistakenly refer to information from an unrelated case. *See*, Def. Memo of Law at pp. 16-17.

At step three of the five-step analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (340-342)  In that regard, the ALJ found that Plaintiff's impairments had only a mild effect on her activities of daily living, but had a moderate impact on her social functioning, concentration, persistence or pace. (341)

Prior to reaching step four of the analysis, the ALJ determined that Plaintiff had the RFC "to perform light work . . . except that the claimant is limited to performing work involving simple 3-4 step processes, should avoid working closely with others or the general public, and is able to tolerate only moderate exposure to respiratory irritants." (342)  In making that determination, the ALJ wrote a lengthy discussion of the medical evidence. (342-345)  At the start of that discussion the ALJ stated:

> In making my findings, I have considered all symptoms and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p.  I have also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

(342)  The ALJ then summarized all of Plaintiff's subjective complaints, including her complaints regarding her headaches. (343)  As for the headaches, the ALJ observed: "[C]laimant states that she suffers from migraine headaches several times a week, which require her to lie down in a dark room for several hours; she notes that she treats her pain with prescription pain medications, including Tylenol 3." (343)

The ALJ stated, however, that Plaintiff's complaints were "not entirely credible," for reasons that he went on to discuss. (343)  For example, the ALJ noted that Plaintiff's mental status examinations were "largely unremarkable," and her mood was "stable."

(343)  Similarly, the ALJ observed that Plaintiff's physical examination by Dr. Toor was

essentially normal. (344-345)   The ALJ indicated that he gave substantial weight to the

opinions of Ransom and Toor.  On the other hand, the ALJ stated that he gave "little

weight" to Hong's opinions regarding Plaintiff's migraines, observing that, "there is a

remarkable absence of evidence in the medical record (i.e. in the form of treatment notes

or otherwise) documenting that the claimant's migraine condition  would impose such

substantial functional limitations." (345)  The ALJ reiterated that he had determined

Plaintiff's RFC "based upon the objective medical records, the opinion[s] of the above-

mentioned medical experts, and taking into account the claimant's subjective allegations."

(345)

    At step four of the five-step analysis, the ALJ found that Plaintiff could perform her

past relevant work, as a factory worker, which was a simple, light, unskilled job.

Consequently, the ALJ found that Plaintiff was not disabled.  In that regard, the ALJ relied

on testimony of a Vocational Expert ("VE"), who indicated that Plaintiff's past work as an

assembler, DOT 706.687-010, could be performed by a person who could perform light

work that was simple, i.e., limited to "three– or four-step processes," who could "tolerate

moderate exposure to respiratory irritants." (366-367)

    With regard to irritants, the ALJ asked the VE to assume a hypothetical claimant

who needed to "avoid more than *ordinary* exposure to pulmonary irritants." (366)

(emphasis added).  The VE responded that in his view, what was "ordinary" would "vary

by the job," and asked if he could substitute the word "moderate," such that the

hypothetical claimant would be able to tolerate moderate levels of irritants, and the ALJ

agreed. (366-367)  The VE indicated, then, that Plaintiff's past work as an assembler

could be performed by someone who could tolerate moderate levels of pulmonary irritants.  As to that point, there is no indication that Plaintiff's past work as an assembler actually involved exposure to any level of pulmonary irritants.  For example, Plaintiff never indicated that her asthma was affected by her working in the factory.

The Court observes that because the ALJ found, at step four of the five-step analysis, that Plaintiff could perform her past work, he did not proceed to step five, and consider whether Plaintiff could also perform other work, as the prior ALJ had done. However, the record indicates that if the ALJ had done so, he could also have found that Plaintiff was not disabled because she was able to perform other work, based on the VE's testimony that there were other jobs which a person could perform who was limited to simple light work which involved exposure to only moderate levels of pulmonary irritants. (367-368)

DISCUSSION

Plaintiff contends that the Commissioner's determination is erroneous, for two reasons.   First, Plaintiff alleges that the ALJ's RFC determination is not supported by the record.  As to that argument, Plaintiff asserts the following points: 1) the ALJ ignored the effects of Plaintiff's headaches and did not explain why; 2) the ALJ did not accurately state the limitations on Plaintiff's ability to tolerate pulmonary irritants, either in his RFC determination or in his hypothetical questions to the VE; and 3) the ALJ did not accurately state Plaintiff's ability to perform simple tasks, either in his RFC determination or in his hypothetical questions to the VE.

Second, Plaintiff maintains that it is unclear whether the ALJ conducted a truly *de novo* review of the evidence, particularly with regard to how he evaluated Plaintiff's

24

credibility.  In that regard, Plaintiff asserts that the ALJ did not adequately explain how he evaluated Plaintiff's credibility, and because of that, it appears he may have relied on the earlier credibility findings by the ALJ during the first hearing.

Beginning with the second argument, the Court finds that the ALJ conducted a *de novo* hearing, and that his credibility determination is not based on an error of law, and is supported by substantial evidence.  At the outset, the Court agrees that Plaintiff's concern on this point is reasonable, given that the ALJ twice referred to this Court's earlier Decision and Order, and further indicated that he had "adopted Judge Siragusa's findings to the matter at hand." (342)  However, viewing the ALJ's decision as a whole, it is clear to this Court that he did in fact conduct an entirely new, *de novo*, hearing.  In that regard, the Court notes first that at the hearing, the ALJ stated that the matter had been remanded, and that he would be making "a new and independent decision." (354)  The ALJ's written decision also stated that he was conducting a *de novo* hearing. *See*, ALJ's Decision, (338) ("I have considered the complete medical history . . . . After careful consideration of all the evidence, I conclude the claimant [is not disabled].")  Furthermore, assuming that Plaintiff's concerns were correct, the ALJ would have presumably confined his analysis to step five of the sequential analysis, which is where the prior ALJ erred. However, it is clear that the ALJ conducted his own analysis of the various steps of the sequential analysis.  For example, at step three, the ALJ found that Plaintiff's shoulder condition was severe, whereas the prior ALJ had not.  Moreover, the ALJ stopped his analysis at step four, while the prior ALJ proceeded, in the alternative, to step five. Further, the ALJ conducted his own analysis of the medical evidence and of Plaintiff's testimony. (342-345)  Because of all that, the Court concludes that the ALJ's references

to this Court's prior decision was only intended to indicate that his findings, while *de novo*, were consistent with findings that had already been made on essentially the same record.[6]

The Court would also agree with Plaintiff that the ALJ did not devote much discussion to the explicit consideration of Plaintiff's credibility.  For example, the ALJ did not discuss the various factors set forth in 20 CFR 416.929.  Nevertheless, the Court believes that the ALJ conducted a proper analysis of Plaintiff's credibility, and did not merely rely on prior findings by this Court or another ALJ.  Significantly, the ALJ expressly stated that he considered the various relevant factors, including those contained in 20 CFR 416.929. (342)  Moreover, the ALJ stated that he found that Plaintiff's complaints were "not entirely credible for the reasons explained in th[e] decision." (343)  The ALJ then went on to state, concerning Hong's opinions regarding the severity of Plaintiff's headaches, which were based entirely on Plaintiff's subjective complaints, that there was a "remarkable absence of evidence in the medical record (*i.e.* in the form of treatment notes or otherwise) documenting that the claimant's migraine condition would impose such substantial functional limitations." (345)  On the other hand, there is substantial evidence suggesting that Plaintiff's subjective complaints are exaggerated.  For example, Plaintiff cares for herself and her four children with only occasional assistance from her mother, and the record generally indicates that her headaches are controlled with medication.  As to that last point, in March, 2007, Plaintiff indicated that she was having headaches, but Tolomeo remarked that the headaches were previously under control.

---

[6] *See*, ALJ's Decision (345) (Indicating that his finding that Plaintiff could perform her past relevant work was "*consistent with* the findings of the United States District Court which resulted in the remand of this matter[.]") (emphasis added)

(283)  Plaintiff told Tolomeo that she was not sleeping well, but "blame[d] [that] on having a child in the house." *Id*.  In November 2008 Plaintiff told Tolomeo that her headaches had "returned," but Tolomeo observed that Plaintiff had not been taking any medication to prevent the headaches, and she was treating them with only Tylenol and sleep. (284) He prescribed Topamax or, for acute treatment, Naprosyn. *Id*.  There is no indication that Plaintiff saw Tolomeo after that, and between 2009-2010 it appears that Plaintiff only mentioned headaches to Hong/Reed on one occasion, at most. (320, 320-329) Furthermore, in 2010, Reed, who saw Plaintiff more than any other medical professional, stated that Plaintiff did not want to work, but was capable of working. (609)  In March, 2011, Plaintiff mentioned to Holder that she had a history of headaches for which she was seeing a neurologist, but otherwise there is no mention of headaches in any records from 2011.  Indeed, except for two visits to Holder's office in March 2011, it does not appear that Plaintiff was seen by any medical doctor in 2011, for any reason. (599-601) The next reference to headaches is not until July 2012, when Plaintiff returned to Reed for a "recheck" of her migraines. (611)  Consequently, the ALJ's observation, that there was a  "remarkable absence of evidence in the medical record" to support Plaintiff's claimed limitations, seems well-supported.  In addition, while the ALJ did not discuss it in his decision, it is also evident from the transcript that he was troubled and skeptical about Plaintiff's testimony that she took Tylenol 3 for her headaches "all the time," and her subsequent retraction of that statement when the ALJ pointed out that she had not been prescribed Tylenol 3 in a long while. (379-382)

Returning to Plaintiff's first argument, she contends that the ALJ ignored the effects of her headaches and did not explain why.  However, for the reasons just

discussed, the Court disagrees.

Next, Plaintiff maintains that the ALJ did not accurately describe her ability to tolerate pulmonary irritants, either in his RFC determination or in his hypothetical questions to the VE.  However, the Court again disagrees.  Toor indicated only that Plaintiff should avoid irritants that could bother her asthma. (236) ("She should avoid irritants or other factors which can precipitate her asthma.")  From that, the ALJ described Plaintiff, in his hypothetical, as someone who must "avoid more than ordinary exposure to pulmonary irritants." (366)  The VE responded that what was "ordinary" would "vary by the job" (367), and he instead proposed the term "moderate," as opposed to "concentrated." *Id*.  In this circumstance, the ALJ's adoption of the term "moderate" as a substitute for "ordinary," and as opposed to "concentrated," did not misrepresent Plaintiff's condition.

Lastly, Plaintiff maintains that the ALJ did not accurately state her ability to perform simple tasks, either in his RFC determination or in his hypothetical questions to the VE. In short, Plaintiff contends that although Ransom indicated that Plaintiff could perform 'simple' tasks, she did not define the term, and therefore the ALJ had no basis to find that Plaintiff could perform tasks requiring three-or-four steps.[7]  Plaintiff contends, in that regard, that the Dictionary of Occupational Titles ("DOT") refers to "simple" tasks as involving "one- or two-step instructions."[8]  The phrase that Plaintiff cites is from the DOT's definition for "01 Level Reasoning Development," which is the lowest possible level, and indicates that a person with that level of reasoning development can "[a]pply

---

[7]*See*, Pl. Memo of Law [#8-1] at p. 18 ("[W]hile the description of ability for 'simple' tasks is supported in the record by Dr. Ransom's opinion . . . there is no indication in the record as to the basis for the ALJ to consider Ms. Lugo capable of 'three- or four-step processes.'").

[8]Id.

commonsense understanding to carry out simple one- or two-step instructions [and d]eal with standardized situation with occasional or no variables in or from these situations encountered on the job."[9]  The job of assembler, 706.687-010, requires an "02 Level Reasoning Development," for which the worker must "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and d]eal with problems involving a few concrete variables in or from standardized situations."  Plaintiff contends that since the DOT uses the term "simple" only in connection with "one- or two-step instructions," that the ALJ erred in finding that Plaintiff could perform work involving three or four steps.[10]

However, the Court believes that the ALJ's determination that Plaintiff can perform tasks involving three or four steps is supported by substantial evidence in the record.  At the outset, the section of the DOT which Plaintiff cites does not purport to define the term "simple." That section describes one- and two-step processes as being simple, but does not suggest that a process involving more steps could not also be simple.  Moreover, there is no reason to think that Ransom, who is not a vocational expert, intended her use of the term "simple" to indicate that Plaintiff was only capable of performing jobs within the DOT's GED category R1 (01 Level Reasoning Development)

Furthermore, although Ransom did not specifically define the term "simple" in her report, it appears that her use of the term is consistent with work involving at least three or four steps.[11]  In that regard, Ransom's mental status examination showed that

---

[9] *See*, Dictionary of Occupational Titles, Appendix C:  Components of the Definition Trailer,  § III.

[10] *See*, Pl. Memo of Law [#8-1] at p. 18.

[11]

Plaintiff's thought processes were coherent and goal-directed, her attention, concentration and memory were intact, her cognitive functioning was average, and her insight and judgment were good. (239)  Ransom further noted that Plaintiff could perform all activities of daily living for herself and her young children, drive a car and manage money. (239) Ransom further reported that Plaintiff had completed "1 ½ years of college" (237) (Subsequent to Ransom's examination Plaintiff took online college courses for nursing, and reportedly told Ersteniuk that she was "doing fine" with that endeavor. (278, 298)).  Such findings do not reasonably suggest that Plaintiff is limited to performing only one- or two-step processes.  Accordingly, the ALJ's finding that Plaintiff could perform tasks requiring three or four steps is supported by substantial evidence.

CONCLUSION

Plaintiff's motion (Docket No. [#8]) for judgment on the pleadings is denied and Defendant's cross-motion [#9] for judgment on the pleadings is granted.  The Clerk of the Court is directed to close this action.

So Ordered.

Dated: Rochester, New York
            June 24, 2014

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge